UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA MANZANO,<br><br>         Plaintiff,<br><br> v.<br><br>SOUTHERN INDIAN HEALTH COUNCIL, INC.; DOES 1–50, inclusive,<br><br>         Defendants. | Case No. 20-cv-02130-BAS-BGS<br><br>**ORDER**<br><br>**(1) GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 5);**<br><br>**AND**<br><br>**(2) DENYING AS MOOT DEFENDANT'S MOTION TO SEAL OR STRIKE (ECF No. 12)** |

 Plaintiff Carolina Manzano ("Plaintiff") brings this action alleging harassment and wrongful termination while she was employed by Defendant Southern Indian Health Council, Inc. ("Defendant" or "SIHC"). (*See generally*, Compl, ECF No. 1.)[1] Defendant moves to dismiss the action on the bases that SIHC is entitled to tribal sovereign immunity, divesting this Court of subject matter jurisdiction and, alternatively, that Plaintiff has failed to state claims upon which relief can be granted. (ECF No. 5.) Plaintiff opposes, and Defendant replies. (ECF Nos. 7, 8, 10.) The Court finds the Motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); CivLR 7.1(d)(1). For the reasons stated below, the Court **GRANTS** the Motion to Dismiss for lack of subject matter jurisdiction.

---

[1] Plaintiff brings causes of action for retaliation in violation of the federal and California False Claims Acts and California Labor Code §§ 235.5 and 1102.5, discrimination in violation of the Uniformed Services Employment and Reemployment Rights of Act (USERRA), and wrongful termination in violation of public policy.

# I. BACKGROUND[2]

SIHC was formed by seven tribes—the Barona Band of Mission Indians, the Campo Band of Mission Indians, the Ewiiaapaayp Band of Kumeyaay Indians, the Jamul Indian Village of California, the La Pasta Band of Mission Indians, the Manzanita Band of the Kumeyaay Nation, and the Viejas Band of Kumeyaay Indians ("Member Tribes")—to provide health care to American Indians and other residents of its service area. (Compact of Self-Governance ("Compact") at 2, Ex. B to Decl. of Tiffany Salayer ("Salayer Decl."), ECF No. 10-1.)[3] Specifically, SIHC's duties are "to improve the physical, mental and spiritual health of American Indians of the member tribes of San Diego County through the active involvement of tribes as partners in enhancing the quality of life of their communities[,]" including improving environmental health, sanitation, health education, support for social services, and cultural preservation. (Second Am. and Restated Bylaws of SIHC ("Bylaws") §§ 3.1, 3.2(a)–(e), Ex. A to Decl. of Laura Caswell ("Caswell Decl."), ECF No. 5-2.)

Initially, SIHC "began as a satellite operation of the Indian Health Council in Pauma Valley[,]" during which it "operated out of trailers on the Sycuan reservation." (March 2017 Pamphlet ("Pamphlet") at 18, Ex. C to Caswell Decl., ECF No. 5-2.) It incorporated as a nonprofit corporation in 1982 and moved to the Barona Reservation. (*Id.*) In 1987, SIHC's Board of Directors acquired private land in Alpine, California, which was placed into a federal trust and serves as the entity's permanent location. (*Id.*) SIHC provided health services "for many years under self-determination contracts with the Indian Health Service [("IHS")]," a federal agency within the Department of Health and Human Services, which recognized SIHC "as a tribally-operated service unit." (Compact at 2.) In 2014, SIHC entered into a Compact[4] with IHS, in which IHS transferred authority to SIHC

---

[2] Because the Court finds the issue of subject matter jurisdiction dispositive, the background does not include the facts underlying Plaintiff's claims and instead focuses on facts relevant to tribal sovereign immunity, including SIHC's structure, responsibilities, and composition.

[3] The Court addresses Plaintiff's evidentiary objections to the Compact and other exhibits below.

[4] The full title is "Compact Between [SIHC], on behalf of the Barona Band of Mission Indians, the Campo Band of Mission Indians, the Ewiiaapaayp Band of Kumeyaay Indians, the Jamul Indian

pursuant to Title V of the Indian Self-Determination and Education Assistance Act ("ISDEAA") "to decide how federal programs, services, functions and activities . . . shall be funded and carried out" and to "promote[] the autonomy of the Tribes in the field of health care." (Compact § 1.2.1.) Under the Compact, SIHC is authorized "to plan, conduct, consolidate, administer, and receive full tribal shares of funding for all programs, services, functions and activities . . . that are carried out for the benefit of American Indians . . . ." (*Id.* at 2.) SIHC entered the Compact on behalf of the Member Tribes. (*Id.*; *see also* Requests for Participation, Ex. B to Caswell Decl., ECF No. 5-2.)

The Member Tribes must "meet the following requirements: (a) are federally recognized, (b) are located in San Diego County; and (c) are admitted to membership by a vote of the Board." (Bylaws § 5.2.) The Member Tribes can apply for or withdraw from membership through a duly adopted tribal General Council resolution. (*Id.* §§ 5.3, 5.4(a).) The Board of Directors, which is the seat of SIHC's corporate power, is composed of one individual appointed from each Member Tribe to serve as director and an alternate. (*Id.* § 6.4.) All directors and alternates must be enrolled in the Member Tribe that appointed them. (*Id.* § 6.7.) The Board directly supervises the CEO, to whom all day-to-day operations are delegated, and each director is required to keep their Member Tribe apprised of the activities and services of SIHC. (*Id.* §§ 6.18, 6.2.) The Board itself has expansive powers to shape SIHC's services, control SIHC's finances and manage all funds received, and oversee how SIHC's conducts its operations. (*Id.* § 6.3(a)–(j).)

## II.    LEGAL STANDARD

Under Rule 12 of the Federal Rules of Civil Procedure, a party may move to dismiss a claim based on a lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *see also* Fed. R. Civ. P. 12(h)(3) (requiring a court to dismiss an action "[i]f the court determines at any time that it lacks subject-matter jurisdiction"). Subject-matter jurisdiction concerns

Village of California, the La Posta Band of Mission Indians, the Manzanita Band of the Kumeyaay Nation, and the Viejas Band of Kumeyaay Indians, and the United States of America, effective November 1, 2014."

"the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998). "Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). District courts are therefore required to decide issues of subject matter jurisdiction before addressing the merits of the case. *Steel Co.*, 523 U.S. at 94–95. "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

Although the Ninth Circuit has characterized tribal sovereign immunity as only "quasi-jurisdictional" in nature, it has also held that "Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1110–11 (9th Cir. 2015) (quotation and citation omitted). When addressing a 12(b)(1) challenge based on sovereign immunity, a district court "may review any evidence . . . to resolve factual disputes concerning the existence of jurisdiction." *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). When a plaintiff is asserting subject matter jurisdiction, the plaintiff must show that tribal sovereign immunity does not apply to bar suit. *See Kokkonen*, 511 U.S. at 377; *Pistor*, 791 F.3d at 1111. In these situations, "no presumptive truthfulness attaches to [a] plaintiff's allegations." *Pistor*, 791 F.3d at 1111.

## III.   ANALYSIS

The Court first addresses Plaintiff's objections to Defendant's exhibits in support of its Motion to Dismiss before turning to whether Plaintiff has established that SIHC cannot invoke tribal sovereign immunity to bar this suit.

### A.     Evidentiary Objections

Plaintiff objects to numerous attestations made in the Caswell Declaration and to the Compact attached to Defendant's Reply. (ECF Nos. 7-1, 11.) Regarding the declaration, the Court finds no need to rely on all but one of the objected-to statements by Caswell because the same information is contained in other exhibits that Plaintiff either does not

object to or has herself proffered into evidence.[5]  As to Plaintiff's objections to the Compact, because it concerns facts essential to the issue of sovereign immunity, the Court addresses these evidentiary challenges in more detail below.

### 1. Untimeliness

First, Plaintiff states the Compact is untimely because it was not filed with SIHC's moving papers, but with its Reply brief.  She contends that the Compact is an entirely new exhibit and not, as Defendant represents, merely a complete version of an exhibit attached to its Motion, which included only the tribal resolutions stating each Member Tribes' intent to have SIHC enter into the Compact on their behalf.  (*See* Requests for Participation.)

Generally, "[n]ew evidence submitted as part of a reply is improper because it does not allow the defendant an adequate opportunity to respond."  *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) (citations and quotations omitted).  As such, if courts elect to consider materials submitted in a reply brief, they must afford the opposing party an opportunity to respond.  *See Mohsin v. California Dep't of Water Res.*, 52 F. Supp. 3d 1006, 1009 (E.D. Cal. 2014) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)); *Daghlian v. DeVry Univ., Inc.*, 461 F. Supp. 2d 1121, 1144 (C.D. Cal. 2006); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1105 (N.D. Cal. 2001).

Here, Plaintiff responded to the later-filed Compact attached to SIHC's Reply by filing objections to its authentication and admissibility.  (ECF No. 11.)  Given that Plaintiff has had an opportunity to respond to this late filing, the Court finds consideration of the Compact would be proper.  Furthermore, the Court finds no reason to doubt counsel's explanation, under oath, that the Compact's omission from the Motion was an administrative error on the part of counsel.  (*See* Salayer Decl. ¶ 3 ("It was brought to my attention that I inadvertently attached an incomplete copy of the Compact . . . .").)  This

---

[5] The Court relies on a SIHC pamphlet for many of these facts, which Caswell attests is a "true and correct copy."  (Caswell Decl. ¶ 16.)  Plaintiff does not raise any evidentiary objections to the Pamphlet but objects to statements made by Caswell in her declaration that repeat these same facts.  At the same time, however, Plaintiff seeks that the Court take judicial notice of a webpage containing the same information.  (*See* Ex. 4 to Decl. of Dennis Brady ("Brady Decl."), ECF No. 8.)  As such, the Court does not understand Plaintiff to object to the facts in the Pamphlet and relies on them in this Order.

representation of events comports with the other evidence provided in this case: The language of the Caswell Declaration expressly intends to authenticate the Compact as an attached exhibit (*see* Caswell Decl. ¶ 12 ("Attached to the Notice of Lodgment as Exhibit B is a true and correct copy of the compact entered into between SIHC and IHS.")) and the resolutions attached to the Caswell Declaration—which Plaintiff does not object to on any basis—expressly adopt the Compact itself.

Considering these circumstances, the Court finds that the exhibit can be properly considered as an attachment to the Reply. Plaintiff's objection on the basis of untimeliness is **OVERRULED**.

## 2. Relevance

Second, Plaintiff objects on the basis of relevance, arguing that because the Compact shows that IHS and SIHC could not come to an agreement about whether sovereign immunity extended to a tribal organization, it is not relevant to the issue of sovereign immunity. This argument is meritless. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action." *See* Fed. R. Evid. 401. Aside from the dispute over sovereign immunity, the Compact memorializes in detail the purpose of SIHC, how power was transferred between IHS and SIHC to serve the tribal community, SIHC's financial set-up, and its intent regarding sovereign immunity. These facts make more or less probable whether, after this transfer of power, SIHC plays a role in and maintains a relationship with the tribal community that would make it an "arm of the tribe" and therefore afford it sovereign immunity. *See White v. University of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014). Because the Compact is clearly relevant, Plaintiff's relevancy objection is **OVERRULED**.

## 3. Authentication

Lastly, Plaintiff argues that the Compact has not been properly authenticated because SIHC has failed to produce a witness with credible knowledge to support that the Compact is what it claims to be. She argues that neither the Salayer Declaration accompanying the

- 6 -

Reply nor the Caswell Declaration accompanying the Motion provide a sufficient basis for authentication.

As aforementioned, Salayer's declaration sufficiently states that the Compact's omission from the Motion was inadvertent and that proper authentication was intended to be provided via the Caswell Declaration. The Court finds no issue with this belated attribution. Thus, the only remaining question is whether Caswell properly authenticated the Compact. Plaintiff has raised several evidentiary challenges to Caswell's authentication, including whether she has provided a sufficient statement of personal knowledge to support it.

Authentication requires the proponent of an item of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The burden to authenticate under Rule 901 is not high." *United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018); *see also United States v. Ceballos*, 789 F.3d 607, 618 (5th Cir. 2015) (characterizing the proponent's burden as "low"). In the trial context, the court "must merely conclude that the jury could reasonably find that the evidence is authentic, not that the jury necessarily would so find." *Recio*, 884 F.3d at 236–37.

A document can be authenticated in several ways. A witness can authenticate a document by providing sufficient evidence "to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 901(1), 602. "Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. A document can also be authenticated by the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(1), (4).

Caswell's statement of personal knowledge is as follows:

I am the acting Chief Executive Officer ("CEO") at Southern Indian Health Council, Inc. (hereinafter "SIHC"). I have been employed at SIHC since August 2013 and was appointed Chief Operating Officer of SIHC in August 2014. I became the Acting Chief Executive Officer of SIHC on May 23, 2019, and remained in that position until July 6, 2020 and was reinstated in that role

on October 6, 2020. My responsibilities as Acting CEO and COO include having a historical understanding of SIHC's formation, its governance, its relationship with the seven tribes which formed SIHC, our patients and community.

(Caswell Decl. ¶ 1.) Caswell also states that she has personal knowledge of the facts in her declaration and could testify competently to them if necessary. (*Id.* ¶ 2.) Regarding the Compact, Caswell states that it "is a true and correct copy of the compact entered into between SIHC and IHS." (Caswell Decl. ¶ 12.)

Plaintiff argues that because Caswell was not employed by SIHC at that time of its formation, she does not have the requisite personal knowledge to attest to its alleged formation under tribal law. Further, Plaintiff objects to Caswell's claim that she has "a historical understanding" of SIHC as too vague and ambiguous to form a proper foundation for her statements. For these same reasons, Plaintiff contends that the Compact has not been properly authenticated.

The Court finds that Caswell's statement of personal knowledge and her confirmation that the Compact is a true and correct copy are sufficient to authenticate the Compact. Caswell has been employed with SIHC since August 2013 and became Chief Operating Officer in August 2014. The resolutions adopting the Compact—which, again, Plaintiff has not objected to—are dated in mid-July 2014, during Caswell's tenure. The Compact itself was purportedly signed in October 2014 and effective November 2014. It can be inferred from these facts that Caswell was employed at SIHC when the Compact was negotiated and entered into, and for part of that period held an executive position. The Court therefore presumes she had personal knowledge of the Compact's formation. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (concluding that a CEO's personal knowledge of various corporate activities could be presumed); *see, e.g.*, *Calop Bus. Sys., Inc. v. City of Los Angeles*, 984 F. Supp. 2d 981, 1007 n.52 (C.D. Cal. 2013) (holding that declaration from a security subcontractor's president stating that he had personal knowledge that a contract between the subcontractor and an airline was "a true and correct copy" was sufficient to authenticate the exhibit), *aff'd in part, appeal*

*dismissed in part*, 614 F. App'x 867 (9th Cir. 2015); *cf. Bauscher v. Brookstone Sec., Inc.*, No. 4:12-CV-00028-BLW, 2012 WL 3100383, at *2 (D. Idaho July 30, 2012) (finding declaration sufficient to authenticate account application where declarant's basis of knowledge was his position as CEO and his claim that such applications were required by the company to open new accounts).

Moreover, Plaintiff has not provided any evidence contesting the authenticity of the Compact, even in her supplemental objections to its authenticity provided in response to Defendant's Reply. Indeed, Plaintiff is mentioned as a point of contact in an exhibit to the Compact as SIHC's then-CEO, and she at no time contests that SIHC entered into a Compact with the government. (Multi-Year Funding Agreement ("MYFA") § 18, Attachment B to the Compact, ECF No. 10-1.) Thus, her challenge to Caswell's ability to authenticate the document does not defeat Defendant's satisfaction of its low burden on authentication. *See Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1154 (D.N.M. 2018) (rejecting authentication challenge to a purchase agreement where the document appeared to be what it purported to be, a corporate entity successor produced the document, and the plaintiff gave the court "no evidence to question" the contract's genuineness).

Lastly, the Court finds the substance and context of the Compact are sufficient to authenticate it under Fed. R. Evid. 901(4). The Compact is a 20-page contract that appears to carefully delineate the transfer of power from IHS to SIHC. It cites to various provisions of the United States Code and refers to specific funding arrangements and federal programs. Moreover, attached to the Compact are signed resolutions from each Member Tribe expressing an intent to enter into the Compact with IHS, each on letterhead with the respective seal of each tribe. They include language summarizing the Compact that reflects the contents of the Compact itself. Based on these documents, the Court finds sufficient indicia that each of these resolutions are what they purport to be, and in turn, that the Compact is also what it purports to be.

For the aforementioned reasons, Plaintiff's perfunctory challenge to the authenticity of the Compact is **OVERRULED**.

Having considered and overruled all Plaintiff's objections to the Compact, the Court now turns to the issue of tribal sovereign immunity and considers the Compact's contents in its evaluation of the issue. Because the Court does not rely on the other portions of the Caswell Declaration to which Plaintiff has objected, those objections are **MOOT**.

## B. Tribal Sovereign Immunity

The Court now turns to the issue of tribal sovereign immunity. "The doctrine of tribal sovereign immunity derives from the status of Indian tribes as 'separate sovereigns preexisting the Constitution.'" *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1016 (9th Cir. 2016) (quoting *Michigan v. Bay Mills Indian Cmty.* ("*Bay Mills*"), 572 U.S. 782, 788 (2014) (quotations omitted)). "An Indian tribe enjoys sovereign immunity from suit except where Congress authorizes the suit or the tribe waives its immunity." *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 978 (9th Cir. 2006) (citing *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 759 (1998)).

Here, the main contention is whether SIHC, as a tribal organization but not a tribe itself, is entitled to sovereign immunity at all. The Court finds that it is. The Court further finds that Congress has not expressly authorized suit against tribes under either federal statute at issue here—the False Claims Act ("FCA") and USERRA—and that SIHC has not waived its immunity.

### 1. Whether SIHC is entitled to tribal sovereign immunity

Tribal sovereign immunity "extends to business activities of the tribe, not merely to governmental activities." *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006). "When the tribe establishes an entity to conduct certain activities, the entity is immune if it functions as an arm of the tribe." *Id.*; *see also Marceau*, 455 F.3d at 978 (noting that tribal immunity "extends to agencies and subdivisions of the tribe"). To determine whether an entity is an "arm of the tribe," courts examine the following factors:

> (1) the method of creation of the [entity]; (2) [its] purpose; (3) [its] structure, ownership, and management, including the amount of control the tribe has over the entit[y]; (4) the tribe's intent with respect to the sharing of its

sovereign immunity; and (5) the financial relationship between the tribe and the entit[y]."

*White*, 765 F.3d at 1025 (internal quotation marks omitted). The Court evaluates each factor below.

a)    *Method of creation*

The facts in the record demonstrate that SIHC's method of creation weighs in favor of finding it an arm of the tribe. SIHC has operated on tribal land and has provided health services to tribal communities for many years. SIHC today is comprised of federally recognized tribes, all of which passed resolutions authorizing it to assume authority from the government over its services. *See White*, 765 F.3d at 1018, 1025 (finding committee formed by tribal resolutions was a factor supporting it was an arm of the tribe); *Matyascik v. Arctic Slope Native Ass'n, Ltd.*, No. 2:19-CV-0002-HRH, 2019 WL 3554687, at *2 (D. Alaska Aug. 5, 2019) (finding regional health organization comprised of eight tribes which passed resolutions regarding federally funded services was an arm of the tribe); *Wilson v. Alaska Native Tribal Health Consortium*, 399 F. Supp. 3d 926, 933 (D. Alaska 2019) (finding first factor favorable where entity was authorized by the ISDEAA and formed by a consortium of 13 tribes to provide comprehensive healthcare access to the Alaska Native people), *appeal dismissed*, No. 19-35707, 2019 WL 7946348 (9th Cir. Dec. 30, 2019). Thus, the Court finds SIHC's method of creation weighs in favor of finding it is an arm of the tribe.

Plaintiff's arguments to the contrary are not persuasive. While it is true, as Plaintiff states, that SIHC's articles of incorporation do not describe SIHC as a tribal corporation or specify any tribal status or affiliation (Ex. 1 to Brady Decl., ECF No. 8), articles of incorporation that are silent regarding sovereign immunity are not dispositive of an entity's claim to sovereignty. *See Wilson*, 399 F. Supp. 3d at 932 ("That [the entity's] Articles of Incorporation do not explicitly state that it has sovereign immunity, is not fatal to [the entity's] sovereignty status either."); *see also McCoy v. Salish Kootenai Coll., Inc.*, 334 F. Supp. 3d 1116, 1123 (D. Mont. 2018), *aff'd*, 785 F. App'x 414 (9th Cir. 2019).

20cv2130

To the extent Plaintiff argues that SIHC's incorporation solely under state law defeats a favorable finding on this factor, case law is indeterminate on this point. Courts have held that an entity's state incorporation does not preclude tribal status, at least where the entity is also incorporated under tribal law. *See Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1134 (9th Cir. 2006) (found a college to be a "tribal entity" for purposes of tribal court jurisdiction where it was incorporated under tribal and state law); *Cain v. Salish Kootenai Coll., Inc.*, No. CV-12-181-M-BMM, 2018 WL 2272792, at *1 (D. Mont. May 17, 2018) ("The dual incorporation of the College under tribal law and state law does not disqualify the College from functioning as a tribal entity."); *but see McCoy v. Salish Kootenai Coll., Inc.*, 785 F. App'x 414, 415 (9th Cir. 2019) (unpublished) (concluding that, where a college initially incorporated under tribal law and later incorporated under Montana law, the method of creation factor was not met because the action was "against the Montana corporation, not the tribal corporation").

In contexts outside of sovereign immunity,[6] courts have held that incorporation under state law does not change an entity's tribal status. *See, e.g.*, *E.E.O.C. v. Navajo Health Found.-Sage Mem'l Hosp., Inc.*, No. CV 06-2125-PCT-DGC, 2007 WL 2683825, at *3 (D. Ariz. Sept. 7, 2007) (finding that although hospital was incorporated as a nonprofit under Arizona law, this did not affect its status as Indian tribe under Title VII); *Giedosh v. Little Wound Sch. Bd., Inc.*, 995 F. Supp. 1052, 1058 (D.S.D. 1997) (holding that school board's incorporation as a nonprofit under South Dakota law did not affect its status as an "Indian tribe" not covered by Title VII); *see also Duke v. Absentee Shawnee Tribe of Oklahoma Hous. Auth.*, 199 F.3d 1123, 1125 (10th Cir. 1999) ("[T]he mere organization of such an entity under state law does not preclude its characterization as a tribal organization as well."). Because the majority of the case law does not consider state

---

[6] In cases involving tribal court jurisdiction, the Ninth Circuit has looked to tribal sovereign immunity decisions for guidance, finding it "useful to look at analogous cases, outside the area of tribal civil jurisdiction, where courts have been called upon to identify tribal entities." *Smith*, 434 F.3d at 1133. Conversely, here, the Court looks to analogous tribal jurisdiction cases outside the sovereign immunity context where courts have grappled with similar questions about tribal status.

incorporation detrimental to tribal status, the Court concludes that SIHC's incorporation under state law does not mean its method of creation weighs against its claim to sovereignty.

Second, Plaintiff argues that because SIHC is not located on tribal land, it is not an arm of the tribe. (Opp'n at 4–5.) Plaintiff cites to two attached statements of information SIHC filed with the California Secretary of State in August 2018 and December 2019, both of which list SIHC's business address in Alpine, California.[7] However, the statements do not indicate whether this land is private land or tribal land. Further, the record reflects that the Alpine site was placed in a federal trust. (Pamphlet at 18.) Land acquired in trust by the United States for the benefit of a tribe is understood as being subject to tribal jurisdiction. *See Club One Casino, Inc. v. United States Dep't of the Interior*, 328 F. Supp. 3d 1033, 1047 (E.D. Cal. 2018) (holding that the land acquired in trust by the United States for the benefit of a tribe is "set apart for the use of the tribe and under federal superintendence" and that this "fee-to-trust process shifted at least some jurisdiction to the tribe"), *aff'd sub nom. Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142 (9th Cir. 2020). Thus, Plaintiff has not met her burden to show that SIHC's location undermines its claim to sovereignty.

Based on the above explanation, the Court finds this factor weighs in favor of finding SIHC an arm of the tribe.

           b)   *Purpose*

SIHC's stated purpose is to provide healthcare services to tribal communities in the San Diego area. (Compact at 2; Bylaws §§ 3.1–3.2.) Further, the IHS's transfer of power to SIHC was rooted in principles of autonomy and self-governance. The 2014 agreement transferring power is itself called a "Compact of Self-Governance," which states its intention to promote the autonomy of member tribes in the field of health care,

---

[7] The statements of information, as matters of public record and the accuracy of which is not disputed by Defendant, are proper subjects of judicial notice pursuant to Fed. R. Evid. 201. *See Khoury Invs. Inc. v. Nationwide Mut. Ins. Co.*, No. CV 13-05415-MWF (EX), 2013 WL 12140449, at *2 (C.D. Cal. Sept. 16, 2013).

strengthening the policy of self-determination, and implementing tribal self-governance. (Compact §§ 1.2.1, 1.2.2; *see also* Compact at 2 (noting that the Tribal Self-Governance Program, under which the Compact was instituted, was "in furtherance of the federal policy of American Indian tribal self-determination and self-governance").)

Further, every tribal resolution authorizing SIHC to enter into the Compact expressly stated that the arrangement would "allow SIHC to better assert its sovereign status and that of its Members by assuming greater funding for and control over its operations." (*See generally*, Requests for Participation.) Thus, the record demonstrates that SIHC's purpose is consistent with its status as an arm of the tribe entitled to sovereign immunity. *See, e.g.*, *Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d 1232, 1240 (D. Alaska 2019) (holding that entering into self-determination and self-governance agreements is core to the notion of sovereignty); *see also White*, 765 F.3d at 1025 ("'[P]reservation of tribal cultural autonomy [and] preservation of tribal self-determination,' are some of the central policies underlying the doctrine of tribal sovereign immunity.") (citation omitted).

Plaintiff argues that the fact that SIHC provides health services to individuals outside the tribal community, "like any other health clinic," defeats its sovereignty claim. (Opp'n at 4.) It is true that SIHC is authorized to provide services to individuals who are not members of the Native community. (Compact § 3.4.2; *see also* MYFA § 5.3 ("Direct outpatient services resources from the SIHC clinic are in this MYFA to serve SIHC tribal members and its proportionate share of the unaffiliated Indians living within the Service Area.").) However, the Court does not find the mere fact that an entity serves members of the non-Native community sufficient to defeat its tribal status. Generally, courts rely on specific statistics showing whether an entity primarily provides services to the Native community to find that this factor weighs for or against sovereign immunity. *See, e.g.*, *N.L.R.B. v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 1000 (9th Cir. 2003) (finding the NLRA did not touch on "purely intramural matters" that affected tribal self-governance where nearly half of tribal health service's patients were non-Native and half of the employees who were party to the case were non-Native); *cf. Smith*, 434 F.3d at 1135

- 14 -

(holding that college where most students receiving degrees were Native American and 40% of faculty members were Native American was a tribal entity for purposes of civil tribal court jurisdiction).  Plaintiff has provided no statistical breakdown of the provision of services between Native and non-Native members of the community to support her argument.

Thus, the Court finds SIHC's purpose also favors finding it is an arm of the tribe.

c)    <em>Structure, ownership, and management</em>

Plaintiff offers no evidence to suggest that the structure, ownership, or management of SIHC as an institution defeats a claim of sovereignty.  In any event, the record reflects that SIHC is fully managed by Member Tribes through their representatives on the Board, all of whom are required to be enrolled in the tribes.  The Member Tribes are also required to be federally recognized and must be admitted to membership by vote of the Board.  Considering the authority of the Board—which itself is vested in the Member Tribes—and the absence of any argument to the contrary from Plaintiff, the Court finds this factor also supports a finding of sovereignty.  *See Barron*, 373 F. Supp. 3d at 1240 (finding relevant the fact that "[t]he [entity's] board places control over the [entity's] ownership and management in representatives of the Alaska Native tribes."); *Matyascik*, 2019 WL 3554687, at *2 (finding factor met where entity was "controlled by its Board of Directors, which consist[ed] of elected or appointed members from each of the eight tribal members"); *see also Cain*, 2018 WL 2272792, at *1.

d)    <em>Tribal intent regarding sovereign immunity</em>

It is clear from the Compact that SIHC intended to share in tribal immunity, although IHS disagreed as to whether it could.  (*See* Attachment C to Compact.)  Less clear is whether the Member Tribes themselves intended to share this immunity with SIHC.  While the record does not contain an express statement of intent by the Member Tribes to share sovereign immunity, there are several indications in the resolutions authorizing SIHC to enter into the 2014 Compact with IHS that reflect the Member Tribes' intent to assert their own sovereignty and SIHC's concomitant autonomy.  First, the resolutions state that the

- 15 -

transfer of power between IHS and SIHC was in the interest of the Member Tribes because it would "allow SIHC to better assert its sovereign status and that of its Members by assuming greater funding for and control over its operations." (*See* Requests for Participation.) Second, they permit SIHC to enter the Compact "to carry out the services provided by the SIHC in a manner consistent with the Compact and SIHC's self-governance[.]" (*Id.*) These principles of self-governance and self-determination are central to sovereign immunity, and the Court finds it reasonable to infer that Member Tribes' involvement in a tribal organization like SIHC that seeks to promote these ideals manifests their intent to share sovereign immunity with SIHC. *See McCoy*, 334 F. Supp. 3d at 1123 (finding intent to share sovereign immunity where, in part, entity engaged in "an important component of self-government" and was "closely associated with and controlled by the Tribes").

Moreover, the ISDEAA states that when "'an Indian tribe has authorized . . . an inter-tribal consortium . . . to plan for or carry out programs, services, functions or activities . . . on its behalf . . . [the] inter-tribal consortium . . . shall have the rights and responsibilities of the authorizing Indian tribe,' which includes sovereign immunity." *Wilson*, 399 F. Supp. 3d at 935 (quoting 25 U.S.C. § 5381(b)). Again, the Compact and accompanying tribal resolutions authorize exactly this: that SIHC, after the transfer of power, would assume responsibility to decide how health programs, services, functions, and activities formerly administered by IHS "shall be funded and carried out" in an effort to promote tribal self-sufficiency. (Compact § 1.2.1; *see also* Requests for Participation.) As an inter-tribal consortium under the ISDEAA's definition, it follows that SIHC would also be entitled to tribal sovereign immunity.

Plaintiff does not propose that an express conferral of sovereign immunity is necessary to establish this factor, nor can the Court find any support for this proposition in the case law. Thus, considering the aforementioned facts, the Court finds that they cut in favor of finding the Member Tribes intend to share sovereign immunity with SIHC.

20cv2130

*Financial relationship between SIHC and Member Tribes*

Defendant claims that the symbiotic relationship between SIHC and Member Tribes "proves its financial relationship with the Member Tribes." (Mem. of P. & A. at 11.) Specifically, Defendant argues that without federal government funds provided to SIHC, the Member Tribes would have to provide the health services and related benefits themselves; conversely, SIHC could not secure government funds to provide activities without the participation of the Member Tribes. (*Id.*) Plaintiff does not raise any argument specific to this factor.

Courts have found "this factor weighs in favor of a tribal consortium being an arm of its member tribes because the tribal consortium was largely funded by federal funds intended to allow tribes to carry out their governmental function of providing health care services to their members." *Matyascik*, 2019 WL 3554687, at *3 (citing *Barron*, 373 F. Supp. 3d at 1239 and *Wilson*, 399 F. Supp. 3d at 936); *see also McCoy*, 334 F. Supp. 3d at 1123–24. Indeed, in *McCoy*, the district court found that the interdependence between a college and the tribes was sufficient for a favorable finding on this factor because, in part: (1) the college was eligible for "its primary funding source" solely because of "the Tribes' charter and ongoing sanction"; (2) the college was designated by the tribes to receive ISDEAA funds; (3) the tribes designated the college a tribal entity for "self-determination contracts"; and (4) the tribe leased trust land to the college. 334 F. Supp. 3d at 1123–24. Further, the court held that the college need not be profitable for the tribes for a favorable finding on this factor; the fact that the tribes benefit from the education-focused mission and the financial stability of the college was sufficient. *Id.*

Similarly, here, SIHC receives federal funding due to its authorization by the Member Tribes to enter into ISDEAA self-determination contracts with IHS. (*See* Requests for Participation.) Thus, SIHC cannot receive funding without the involvement of the Member Tribes. (*See* Compact at 2 (noting that Title V of the ISDEAA authorizes the government to implement Compacts and MYFAs with only tribes or tribal organizations that meet the statutory requirements).) Further, SIHC is authorized under

the Compact to "plan, conduct, consolidate, administer, and . . . redesign the services and funding identified within the General Budget Categories as a consolidated tribal government budget" and is allowed to make changes to services or funds "in any manner which SIHC deems to be in the best interest of the health and welfare of the Indian Community being served." (MYFA § 4.) SIHC is also located on tribal trust land (Pamphlet at 18) and entered into the Compact and related Funding Agreement for the express reason of providing tribes "with meaningful authority, control, funding and discretion to plan, conduct, redesign, and administer programs, services, functions, and activities (or portions thereof) that meet the needs of the individual Tribal communities." (Compact § 1.2.2.) As such, the funding secured by SIHC directly benefits the Member Tribes' interest in the health and welfare of its members and in their own self-governance. *See McCoy*, 334 F. Supp. 3d at 1123–24.

The Court finds that this factor, in addition to the other four *White* factors, supports finding SIHC an arm of the tribe. As such, SIHC is entitled to tribal sovereign immunity.

### 2. Whether the FCA or USERRA abrogate tribal sovereign immunity

While tribes generally enjoy immunity from suit "on matters integral to sovereignty and self-governance," Congress still maintains authority to "'limit, modify or eliminate the powers of local self-government which the tribes otherwise possess.'" *White*, 765 F.3d at 1025 (quoting *Santa Clara Pueblo v. Martinez* ("*Martinez*"), 436 U.S. 49, 56 (1978)). To exercise this abrogation power, Congress "must unequivocally express that purpose." *Bay Mills*, 572 U.S. at 790; *see also Deschutes River All. v. Portland Gen. Elec. Co.*, __ F. 4th __, No. 18-35867, 2021 WL 2559477, at *4 (9th Cir. June 23, 2021) ("We must be able to say with perfect confidence that Congress meant to abrogate . . . sovereign immunity.") (citation and quotations omitted). In other words, while "the United States may sue Indian tribes and override tribal sovereign immunity," *United States v. Yakima Tribal Court*, 806 F.2d 853, 861 (9th Cir. 1986), suits brought by private parties and state governments fail where Congress does not explicitly authorize suits against tribes in the relevant legislation.

*See Pauma v. Nat'l Lab. Rels. Bd.*, 888 F.3d 1066, 1078 (9th Cir. 2018) (citing *Martinez*, 436 U.S. at 59 and *Bay Mills*, 572 U.S. at 803).[8]

Regarding the FCA, the Ninth Circuit has conclusively held that the statute was not intended to apply to Indian tribes at all, thus foreclosing any argument that the statute abrogated tribes' presumptive immunity. *See United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939, 943 (9th Cir. 2017) (finding that the term "person" in the FCA does not include Indian tribes).

USERRA's abrogation of tribal sovereign immunity has not been addressed. The statute defines "employer," in relevant part, as follows:

> (4)(A) Except as provided in subparagraphs (B) and (C), the term "employer" means any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including--
>> (i) a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities;
>> (ii) the Federal Government;
>> (iii) a State;
>> (iv) any successor in interest to a person, institution, organization, or other entity referred to in this subparagraph; and
>> (v) a person, institution, organization, or other entity that has denied initial employment in violation of section 4311.

38 U.S.C.A. § 4303. It is clear that this statutory text does not explicitly apply USERRA to tribes or tribal organization in contravention of their sovereign immunity.

---

[8] In *Donovan v. Coeur d'Alene Tribal Farm*, the Ninth Circuit specified three circumstances in which a statute of general applicability that is silent about whether it applies to Indian tribes would not be held to apply to them. 751 F.2d 1113, 1116 (9th Cir. 1985). However, in *Pauma*, the Ninth Circuit clarified that *Donovan*'s test is applicable to suits brought by federal actors against tribes and tribal entities; cases brought by private, non-federal parties are instead subject to the *Martinez* and *Bay Mills* rule that "generally applicable laws may be enforced against tribes only if an intent to do so is clear, rather than if there is no clear intent to the contrary." 888 F.3d at 1078; *see also Munoz v. Barona Band of Mission Indians*, No. 17-CV-2092-BAS-AGS, 2018 WL 1245257, at *3 (S.D. Cal. Mar. 8, 2018) ("In the context of whether a party may sue an Indian tribe in federal or state court, the question is whether Congress has expressly abrogated tribal sovereign immunity for the particular claims a plaintiff presses."). Accordingly, the Court applies the principles stated in *Martinez* and *Bay Mills* to guide its analysis here.

Where the text, as here, does not include an unequivocal expression of abrogation, the Ninth Circuit has instructed that suits are barred by sovereign immunity "in the absence here of any unequivocal expression of contrary legislative intent[.]" *Martinez*, 436 U.S. at 59. Plaintiff cites to a piece of legislative history that, she contends, expresses such contrary intent. (Opp'n at 10.) A 1993 Senate Report on USERRA by the Committee on Veterans' Affairs states that the law applies "to all employers, regardless of the size of the employer or the number of employees, and would include Native American tribes and their business enterprises." S. Rep. No. 103-158, at 42 (1993).

However, considering broader circumstances, the Court does not find that this statement evinces *unequivocal* legislative intent. In addition to the Senate Report, a House Report issued prior to USERRA's passage recommended amending § 4303(4) to explicitly include "Native American tribes and their business enterprises" in the definition of "employer." H.R. Rep. 103-65, pt. 1, at 58 (1993). The House found that an explicit statement of intent to include tribes within the ambit of the law was necessary to "void problems of interpretation that have arisen where Congress has been silent on the issue." (*Id.*) But it is clear that this recommendation was never adopted, as this language did not make it to the final text of the statute. *See Cent. Inst. for Experimental Animals v. Jackson Lab'y*, No. C-08-05568 RMW, 2010 WL 1240760, at *5 (N.D. Cal. Mar. 26, 2010) (finding legislative history inconclusive where final text of statute that did not contain limitation expressed in first draft of statute, which could be understood as showing Congressional intent not to include limitation). Moreover, the statute includes no reference to tribes at all, undermining the notion that Congress unambiguously sought to override the presumption of immunity and apply USERRA's mandate to them. *Cf. Cain*, 862 F.3d at 943 (finding no "affirmative showing" that the FCA was intended to include tribes within its definition of "person" where "[t]he statute doesn't once mention tribes").

Therefore, the Court cannot say with any confidence—let alone "perfect confidence"—that Congress intended to abrogate tribal sovereign immunity. *See Deschutes River All.*, 2021 WL 2559477, at *4 ("An intention to abrogate tribal sovereign

- 20 -

immunity must be unmistakably clear.") (quotations omitted); *see also Bay Mills*, 572 U.S. at 790 ("[C]ourts will not lightly assume that Congress in fact intends to undermine Indian self-government.") (quotation marks, alterations, and citations omitted); *Martinez*, 436 U.S. at 60 ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."). Accordingly, viewing these federal statutes against the backdrop of considerations of Indian sovereignty, the Court finds that neither the FCA nor USERRA abrogate tribal sovereign immunity. *See Pauma*, 888 F.3d at 1078.

### 3.  Whether SIHC has waived tribal sovereign immunity

"There is a strong presumption against waiver of tribal sovereign immunity." *Demontiney v. U.S. ex rel. Dept. of Interior, Bureau of Indian Affairs*, 255 F.3d 801, 811 (9th Cir. 2001). "Any waiver must be unequivocal and may not be implied." *Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir. 1996); *see also Martinez,* 436 U.S. at 58 ("It is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed."). "The plaintiff bears the burden of showing a waiver of tribal sovereign immunity." *Ingrassia v. Chicken Ranch Bingo and Casino*, 676 F. Supp. 2d 953, 956–57 (E.D. Cal. 2009).

Here, Plaintiff argues that Defendant's failure to raise sovereign immunity in its Bylaws and corporate filings should be deemed waiver. (Opp'n at 9–10.) However, as aforementioned, waivers of tribal sovereign immunity must be express. Even if a tribe demonstrates a willingness to submit to federal lawsuits, agrees to comply with federal law, or incorporates federal law into its own governing documents, this does not establish waiver. *See Allen*, 646 F.3d at 1047; *Demontiney*, 255 F.3d at 814; *Nanomantube v. Kickapoo Tribe in Kansas*, 631 F.3d 1150, 1153 (10th Cir. 2011). Thus, the Court cannot infer that SIHC waived its sovereign immunity based solely on the omission of any mention of immunity in some of its documents or filings. In addition, to the extent Plaintiff contends that SIHC's incorporation under state law constitutes waiver, this also fails because tribal organizations do not waive sovereign immunity merely by incorporating under state law.

*White*, 765 F.3d at 1025–26; *E.E.O.C. v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1080 (9th Cir. 2001). Thus, Plaintiff has not demonstrated waiver of tribal sovereign immunity.

Having found that SIHC is entitled to tribal sovereign immunity, that Congress has not abrogated this immunity in the applicable statutes, and that Plaintiff has not met her burden of showing that SIHC waived it, SIHC is immune from suit and the Court has no subject matter jurisdiction over this action.

### C.    Motion to Strike/Seal

SIHC also files a Motion to Seal or Strike Statements in Plaintiff's Complaint, Plaintiff's Opposition to Defendant's Motion to Dismiss, and Plaintiff's Declaration in support of her Opposition. (ECF Nos. 12, 13.) SIHC argues that statements in these documents describing a response from SIHC's counsel to Plaintiff's alleged workplace complaints are protected by attorney-client privilege. The Court need not address this Motion because the Court did not rely on any of the contested statements in arriving at its decision about subject matter jurisdiction, which does not reach the merits of Plaintiff's underlying claims.

## IV.    CONCLUSION

Accordingly, the Court:

(1)    **DENIES AS MOOT** Defendant's Motion to Seal or Strike Statements in Plaintiff's Complaint Plaintiff's Opposition to Defendant's Motion to Dismiss, and Plaintiff's Declaration in support of her Opposition (ECF No. 12); and

(2)    **GRANTS** Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 5) and **DISMISSES WITH PREJUDICE** this action. The Clerk is directed to close the case.

**IT IS SO ORDERED.**

**DATED: July 7, 2021**

Hon. Cynthia Bashant
United States District Judge